David M. Bernstein, DPM Chairman, Podiatric Medical Board Department of Health PO Box 47852 Olympia, WA 98504
Dear Dr. Bernstein:
By letter previously acknowledged, you have requested our opinion on the following paraphrased question:
 Is the practice of sharp debridement within the scope of practice for occupational therapists?
 BRIEF ANSWER
No. Sharp debridement is not within the scope of practice for occupational therapists.
 ANALYSIS
The scope of practice for occupational therapists is governed by the statutory definition of occupational therapy. That definition provides:
 "Occupational therapy" is the scientifically based use of purposeful activity with individuals who are limited by physical injury or illness, psychosocial dysfunction, developmental or learning disabilities, or the aging process in order to maximize independence, prevent disability, and maintain health. The practice encompasses evaluation, treatment, and consultation. Specific occupational therapy services include but are not limited to: Using specifically designed activities and exercises to enhance neurodevelopmental, cognitive, perceptual motor, sensory integrative, and psychomotor functioning; administering and interpreting tests such as manual muscle and sensory integration; teaching daily living skills; developing prevocational skills and play and avocational capabilities; designing, fabricating, or applying selected orthotic and prosthetic devices or selected adaptive equipment; and adapting environments for the handicapped. These services are provided individually, in groups, or through social systems.
RCW 18.59.020(2). State law prohibits practicing occupational therapy without a license. RCW 18.59.031.
Your question involves a proposed "interpretative statement" under consideration by the Occupational Therapy Practice Board (Board). You provided a copy of a draft with your opinion request. That draft statement concludes: "The board is interpreting the occupational therapy scope of practice (RCW 18.59.020) to include sharp debridement and wound care management." Occupational Therapy Practice Board, [Draft] Interpretive Statement: Wound CareManagement and Sharp Debridement (draft interpretive statement) (attached as Attachment A). We understand that, although the Board has not yet acted upon this draft interpretive statement, a more recent draft limits the conclusion to "non-surgical" sharp debridement. You ask whether the Board would be correct in adopting this construction of state law.
Although the draft interpretive statement, and your request for our opinion, both refer to "wound care" in addition to "sharp debridement," our analysis focuses on sharp debridement. We do so because your request and the comments we have received regarding your request emphasize that the practice of sharp debridement is the focus of concern. "Wound care" is the more general of these two terms, and includes sharp debridement, among other practices. HCPro, Inc., Wound Care Under Medicare: Briefings on Outpatient Rehab:Reimbursement and Regulations, October 1, 2009, at *8, synopsisavailable at
http://www.hcpro.com/RHB-239681-61/Wound-care-under-Medicare.html (last visited Jan. 14, 2010) (listing debridement among treatments included in wound care); see also Visiting Nurse Associations of America, Wound and Skin Care Center:Debridement, at *3, available at http://www. vnaa.org/VNAA/g/ Default.aspx?h=html/wound_center_Oct ppview=1 (last visited Jan. 14, 2010) (describing debridement as "an important component of wound bed preparation"). As described below, occupational therapists perform certain wound-related functions, but because the focus of your concern is on the practice of sharp debridement, we do not attempt to comprehensively address that role.
You ask whether the practice of "sharp debridement" falls within this statutory definition of occupational therapy. "Debridement" means "the surgical removal of lacerated, devitalized, or contaminated tissue." Webster's Third New International Dictionaryof the English Language 582 (2002). You explain, in posing your question, that "[s]harp debridement is the removal of dead or necrotic tissue or foreign material using a scalpel or scissors from and around a wound to expose healthy tissue and optimize wound healing."
 An online medical dictionary offers an additional definition and explanation:
 Debride: To remove dead, contaminated or adherent tissue or foreign material. The purpose of wound debridement is to remove all materials that may promote infection and impede healing. This may be done by enzymatic debridement (as with proteolytic enzymes), mechanical nonselective debridement (as in a whirlpool), or sharp debridement (by surgery).
MedicineNet.com, definition available at
http://www.medterms.com/script/main/art.asp? articlekey=40481 (last visited Jan. 14, 2010).
Another authority, however, distinguishes between "surgical debridement" and "sharp debridement," describing the latter as a more limited procedure:
 Surgical debridement is indicated for large, deep tissue damage, painful wounds, and urgent situations, utilizing scalpels, scissors, forceps, pickups and other instruments. Sharp debridement is usually a minor bedside procedure, with limited removal of nonviable tissue. Although both methods are selective and speedy, surgical and sharp debridement can be painful and require some form of pain control or anesthesia. Only those thoroughly trained, with an extensive understanding of the underlying anatomical structures, should undertake surgical or sharp debridement. Surgical debridement is usually prescribed together with one or more [of] the other methods.
Visiting Nurse Associations of America, Debridement, at *2.
We understand that the Occupational Therapy Practice Board is currently considering the adoption of an "interpretive statement" on wound care management and sharp debridement, and a draft of this statement gives rise to your question. An interpretive statement is an agency's opinion of the meaning of a statute or other authority. RCW 34.05.010(8). Such statements are not rules and are advisory rather than binding. RCW 34.05.230(1);Washington Educ. Ass'n v. Pub. Disclosure Comm'n,150 Wn.2d 612, 619, 80 P.3d 608 (2003) (interpretive statements "have no legal or regulatory effect"). If adopted, the interpretive statement would "serve only to aid and explain the agency's interpretation of the law." Id.
You ask whether the Occupational Therapy Practice Board's proposed interpretation of the law is correct. To answer this question, we return to the definition of "occupational therapy" set forth in statute. The definition is comprised of two parts. The first part sets forth a general statement of what the term "occupational therapy" means. The pertinent language of that part of the statute explains that "`Occupational therapy' is the scientifically based use of purposeful activity with individuals who are limited by physical injury . . . in order to . . . maintain health." RCW 18.59.020(2). It also goes on to state that the practice encompasses "treatment" as well as evaluation and consultation.Id. The first part of the definition accordingly sets forth a very general description of occupational therapy, without defining its scope in specific terms.
It describes occupational therapy as, among other things, "using" "purposeful activity," including "treatment," "with" any individual who is "limited by physical injury" in order to "maintain health." RCW 18.59.020(2); see also WAC 246-847-010(13) (defining "scientifically based use of purposeful activity"). Read broadly and in isolation, that language might suggest that the scope of practice for an occupational therapist is comparable to that of a physician. See RCW 18.71.011 (defining the practice of medicine).[1] This construction seems unlikely, given that the legislature saw the need to establish a separate licensing regime for occupational therapists as a distinct profession, with its own training and licensing requirements.[2] See RCW 18.59.050 (licensing requirements for occupational therapists); see also McGinnis v. State,152 Wn.2d 639, 645, 99 P.3d 1240 (2004) ("The legislature is presumed not to include unnecessary language when it enacts legislation."). It seems more reasonable to conclude that the legislature intended a more limited scope of practice for occupational therapists, but the first part of the definition tells us rather little about how it might be limited; indeed, standing alone, the first part of the definition would suggest no limitations at all.
We may not construe the meaning of "occupational therapy" by referring to the first part of the statute in isolation, in any event. Kilian v. Atkinson,147 Wn.2d 16, 21, 50 P.3d 638 (2002) ("Statutes must be construed so that all the language is given effect and no portion is rendered meaningless or superfluous."). The second part of the statutory definition enlightens the interpretation of "occupational therapy" by setting forth a nonexclusive list of "occupational therapy services." RCW 18.59.020(2). The statute explains that such services "include, but are not limited to," the following:
 Using specifically designed activities and exercises to enhance neurodevelopmental, cognitive, perceptual motor, sensory integrative, and psychomotor functioning; administering and interpreting tests such as manual muscle and sensory integration; teaching daily living skills; developing prevocational skills and play and avocational capabilities; designing, fabricating, or applying selected orthotic and prosthetic devices or selected adaptive equipment; and adapting environments for the handicapped.
RCW 18.59.020(2).
This list of services helps to construe the more general terms of the first part of the statutory definition. Burns v. City ofSeattle, 161 Wn.2d 129, 148, 164 P.3d 475 (2007) ("a doubtful term or phrase in a statute or ordinance takes its meaning from associated words and phrases"); see also Simpson Inv. Co. v. Dep'tof Revenue, 141 Wn.2d 139, 151, 3 P.3d 741 (2000) ("general terms, when used in conjunction with specific terms in a statute, should be deemed only to incorporate those things similar in nature or `comparable to' the specific terms").
It, therefore, follows that the statutory definition of "occupational therapy" encompasses services that are similar to those listed in the second part of the definition, even if it is not strictly limited to those services. None of the services listed in the statute are similar to sharp debridement. The list speaks in terms of exercises, tests, the teaching of skills, and adapting environments. RCW 18.59.020(2). One element in the list explains that occupational therapists may design, fabricate, or apply certain orthotic or prosthetic devices, and the inclusion of this item in the list suggests that occupational therapy encompasses, at least to some extent, activities that relate in some general way to a patient's recovery from or adaptation to a wound. None of the listed services, however, suggest that occupational therapy includes a procedure, such as sharp debridement, that involves the cutting or removal of tissue with a sharp instrument. See definitions of debridement set forth above.
The most recent draft of the interpretive statement, as noted above, narrows the Board's proposed interpretation of the statutory definition to include only "nonsurgical" sharp debridement. An argument might be offered in favor of this more limited inclusion of sharp debridement within the scope of practice of occupational therapy by noting the distinction between surgical and nonsurgical debridement recited above. Visiting Nurse Associations of America,Debridement, at *2. It appears from our sources that debridement procedures vary considerably in their complexity, ranging from "a minor bedside procedure" to an "urgent" surgical procedure involving "large, deep tissue damage." Id. It might be suggested that the former falls within the statutory definition of occupational therapy, while the latter does not. The statute itself, however, suggests no basis for such line-drawing in the guise of statutory construction. The question of which medical professionals possess the requisite training and skill is a policy question best addressed by the legislature. Visiting Nurse Associations of America, Debridement, at *2 ("Only those thoroughly trained, with an extensive understanding of the underlying anatomical structures, should undertake surgical or sharp debridement."); York v. Wahkiakum Sch. Dist. 200,163 Wn.2d 297, 342, 178 P.3d 995 (2008) (J.M. Johnson, J., concurring) (noting the role of legislative fact-finding in policy development).[3]
In some circumstances, the use of the word "includes" in a definition is construed as a term of enlargement, rather than limitation. 2A Norman J. Singer J.D. Shambie Singer, Statutesand Statutory Construction, § 47:7 (7th ed. 2007). One might, therefore, argue that the list of services expands the scope of the definition of "occupational therapy." In the context of RCW 18.59.020(2), however, this would not appear to be the purpose of the listing, as each of the services would fall comfortably within the very general first part of the statutory description of occupational therapy, without being separately identified. In addition, as previously noted, such a construction would suggest that the legislature essentially defined the scope of occupational therapy to encompass the practice of any of the healing arts. It accordingly seems that the scope of occupational therapy is properly understood with reference to the nature of the services specifically called out in the statute. See Burns,161 Wn.2d at 146-47 (using a list of statutory exceptions to a statutory rule to illustrate the nature of the rule itself). We accordingly construe RCW 18.59.020(2) as defining "occupational therapy" to include services similar to those listed in the definition, but not as including such markedly different concepts as sharp debridement.[4]
This conclusion finds further support in an additional statute codified in the same chapter. See Dep't of Ecology v.Campbell Gwinn, L.L.C., 146 Wn.2d 1, 11, 43 P.3d 4 (2002) (the meaning of a statute "is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question"). In addition to defining "occupational therapy," the legislature has also established a duty for occupational therapists to refer certain matters to other medical professionals:
 An occupational therapist shall, after evaluating a patient and if the case is a medical one, refer the case to a physician for appropriate medical direction if such direction is lacking. Treatment by an occupational therapist of such a medical case may take place only upon the referral of a physician, osteopathic physician, podiatric physician and surgeon, naturopath, chiropractor, physician assistant, psychologist, or advanced registered nurse practitioner licensed to practice in this state.
RCW 18.59.100. If an occupational therapist is presented with a "medical" case, he or she must refer the patient to a physician if medical direction is lacking. RCW 18.59.100. The occupational therapist is prohibited from treating such a patient unless referred by one of the listed medical professionals. RCW 18.59.100. This statute reflects legislative recognition that the scope of practice for occupational therapists does not extend to the medical treatment provided by the other medical professions listed in the statute.
We trust that the foregoing will be useful to you.
ROB MCKENNA Attorney General
JEFFREY T. EVEN Deputy Solicitor General
[1] The cited statute provides:
A person is practicing medicine if he does one or more of the following:
 (1) Offers or undertakes to diagnose, cure, advise or prescribe for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, by any means or instrumentality;
 (2) Administers or prescribes drugs or medicinal preparations to be used by any other person;
 (3) Severs or penetrates the tissues of human beings;
 (4) Uses on cards, books, papers, signs or other written or printed means of giving information to the public, in the conduct of any occupation or profession pertaining to the diagnosis or treatment of human disease or conditions the designation "doctor of medicine", "physician", "surgeon", "m.d." or any combination thereof unless such designation additionally contains the description of another branch of the healing arts for which a person has a license: PROVIDED HOWEVER, That a person licensed under this chapter shall not engage in the practice of chiropractic as defined in RCW 18.25.005.
RCW 18.71.011.
[2] A master's degree is ordinarily the minimum educational requirement to be licensed as an occupational therapist. State law requires that licensees complete "the academic requirements of an educational program in occupational therapy recognized by the [Occupational Therapy Practice Board]." RCW 18.59.050(1)(b); but see RCW 18.59.050(2) (authorizing waiver of the educational requirement under specified circumstances). The Board has recognized and approved courses of instruction accredited by the American Occupational Therapy Association's Accreditation Council for Occupational Therapy Education (ACOTE). WAC 246-847-040. The referenced organization has adopted accreditation standards for both master's-degree level and doctoral-level programs. Current ACOTE Accreditation Standards are available online at http://www.aota.org/Educate/Accredit/ StandardsReview.aspx (last visited Nov. 17, 2009). Since neither the statute nor the rule specifically identify the required degree, it appears that the master's degree program is sufficient to meet the educational qualifications for a license. Neither the standards for the master's degree nor for the doctoral degree mention sharp debridement, or even wound care management more generally.Id.
[3] In comments submitted to the Occupational Therapy Practice Board, the American Occupational Therapy Association (AOTA) explained that occupational therapists can be compensated under Medicare for certain limited debridement procedures performed without the need of anesthesia. Letter from Christina A. Metzler, AOTA, to D. Jill Petri, Board, at 2 (Sep. 1, 2009). AOTA repeated this point in written comments to us, quoting a document describing debridement procedures for which occupational therapists may be compensated under Medicare. Letter from Charles Willmarth, AOTA, to Rob McKenna, Washington Attorney General, at 2-3 (Dec. 15, 2009). Medicare compensation, however, suggests little, if anything, regarding the proper construction to give Washington's statutory definition of occupational therapy. We assume AOTA's statements to be factually true, but they do not alter our analysis of the statute or foreclose the options open to the legislature in its policy determinations.
[4] The draft interpretative statement you ask about explains that it "is intended to apply until legislation is passed that clarifies the occupational therapy scope of practice." [Draft] Interpretive Statement at 1. It goes on to state that a bill on the subject is anticipated at the legislature's 2010 session. [Draft] Interpretive Statement at 1. The policy decision as to how the scope of practice for a licensed medical profession should be defined rests, of course, with the legislature. "[T]he legislature may adopt such regulations and restrictions of the healing arts as it may consider necessary for the public good, and the courts will not question the wisdom or desirability of such legislative requirements, so long as there is any reasonable basis upon which the legislative determination can rest." State v. Wilson,11 Wn. App. 916, 919, 528 P.2d 279 (1974) (alteration in original) (quoting Ellestad v. Swayze,15 Wn.2d 281, 291, 130 P.2d 349 (1942)).